UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Elizabeth E. Brown

| | |
|---|---|
| In re:<br><br>MARIE SOLANO,<br><br><br>Debtor. | Bankruptcy Case No. 16-17099 EEB<br>Chapter 7 |
| EMILIA BARR AND MELANIE BARR, as next friend for MOIRA BARR, heirs and interested persons,<br><br>Plaintiffs,<br><br>v.<br><br>MARIE SOLANO,<br><br>Defendant. | Adv. Proceeding No. 16-1447 EEB |

## ORDER

      THIS MATTER comes before the Court following a trial on the Plaintiffs' Complaint seeking to deny Debtor Marie Solano's discharge under 11 U.S.C. § 727 and alleging nondischargeability claims under 11 U.S.C. § 523(a)(2), (a)(4) and (a)(6).[1] Debtor was the girlfriend of Jeffrey Barr. Mr Barr is now deceased. Plaintiffs Emilia and Moria Barr are the daughters and heirs of Mr. Barr; and Melanie Barr is their mother and Mr. Barr's ex-wife.

      Mr. Barr died on January 6, 2014. At the time of his death, he lived with Debtor in an apartment, but they never married. Emilia Barr was nineteen at the time and did not live with her father. Moira Barr was thirteen at the time and spent weekends with her father and had her own bedroom in his apartment. After his death, the relationship between the Debtor and Plaintiffs deteriorated rapidly. Plaintiffs asked Debtor to turn over all of Mr. Barr's personal property, including two vehicles that were titled in his name at the time he died. The Debtor gave Plaintiffs a few of his items, but refused to turn over the bulk of his property. Four days after his death, Debtor filed paperwork with

---

[1] All references to "section" or "§" shall refer to Title 11, United States Code, unless expressly stated otherwise.

the Department of Motor Vehicles to transfer ownership to herself of two of Mr. Barr's vehicles, a 1991 Chevrolet and a 1989 Chevrolet. Neither of these vehicles nor Mr. Barr's personal property had great monetary value, but Plaintiffs wanted them due to their sentimental value. Both sides filed police reports alleging misconduct by the other side.

Approximately one month after Mr. Barr's death, his ex-wife initiated a probate action for the benefit of her daughters. Given the acrimony between the parties, the Plaintiffs sought appointment of a neutral "personal representative" to handle administration of the probate estate, which the probate court granted. Eventually, the personal representative filed a motion seeking return of Mr. Barr's property from the Debtor. Before the probate court could rule on that motion, the Debtor filed a motion alleging she was Mr. Barr's common law wife and she requested removal of the personal representative. The turnover matter was shelved while the probate court held a trial on the common law marriage issue. After a trial in February 2016, the probate court dismissed Debtor's common law wife claim. The Plaintiffs filed a post-trial motion asking the state court to award them their attorney's fees and costs under Colo. Rev. Stat. § 13-17-102, which permits such awards where the court determines a party's action lacked substantial justification.

Although it was not offered as an exhibit at trial, the Plaintiffs have indicated that the state court issued an order on April 4, 2016 (the "April 4 Order") that determined that Debtor's claim lacked substantial justification, and as such, that Plaintiffs were entitled to recover their fees and costs. The April 4 Order did not award Plaintiffs a specific amount, but instructed the Plaintiffs to file affidavits to establish the amount of their fees and costs. On May 18, 2016, the state court apparently entered another order that awarded the Plaintiffs $55,403.45 for their attorney's fees and costs ("May 18 Order"). Again, the Plaintiffs failed to offer this order as an exhibit at trial but nevertheless ask the Court to take judicial notice of it and the April 4 Order.

The Debtor filed her chapter 7 bankruptcy petition approximately three months later on July 19, 2016. Debtor did not immediately notify the Plaintiffs or the probate court about the bankruptcy filing. Lacking knowledge of the automatic stay, the probate court entered a judgment against Debtor on September 9, 2016 for the previously awarded fees and costs in the amount of $55,403.45 (the "September Judgement"). The Plaintiffs also failed to offer this judgment into evidence at trial. The probate court then entered a postpetition order on September 14, 2016, requiring Debtor to turn over Mr. Barr's property to the personal representative. The personal representative testified that Debtor has never turned over any property.

In this adversary proceeding, the Plaintiffs assert two claims under § 727 seeking denial of the Debtor's discharge. In addition, The Plaintiffs allege that two debts the Debtor owes to Plaintiffs should be declared nondischargeable—(1) the $55,403 judgment for attorney's fees and costs awarded by the probate court; and (2) the value of Mr. Barr's personal property that the Debtor has allegedly unlawfully retained.

I. **DENIAL OF DISCHARGE CLAIMS**

    A.    **§ 727(a)(5)**

The Plaintiffs have brought two claims seeking to deny the Debtor a discharge. The first claim is pursuant to § 727(a)(5), which states that a debtor will be denied a discharge when "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). Plaintiffs bear the burden of proof to establish the following elements for this claim: (1) debtor at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) on the date the bankruptcy petition was filed or order of relief granted, the debtor no longer owned the assets; and (3) the bankruptcy pleadings or statement of affairs do not reflect an adequate explanation for the disposition of the assets. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1205 (9th Cir. 2010). "It is insufficient to merely allege that the debtor has failed to explain losses, the plaintiff must produce some evidence of an identifiable asset loss." *Sonders v. Mezvinsky (In re Mezvinsky)*, 265 B.R. 681, 689 (Bankr. E.D. Pa. 2001).

In this case, Plaintiffs have not alleged nor proven that *the Debtor* owned an asset prepetition that she no longer owned on the petition date. Rather, they are alleging she has failed to explain the loss of assets that belonged to *Mr. Barr*. This is not a sufficient basis to deny the Debtor her discharge. In other circumstances, courts have refused to deny a discharge where the debtor did not own or have knowledge of the assets in question. *E.g.*, *Buckeye Retirement Co. v. Bishop (In re Bishop)*, 420 B.R. 841, 857 (Bankr. N.D. Ala. 2009) (declining to deny discharge were lost assets in question belonged to debtor's company, not debtor individually). The purpose of § 727(a)(5) is to "deny a discharge to a debtor who refuses to cooperate with the trustee or creditors in their effort to trace property that should have been part of the [bankruptcy] estate." *Holley Performance Prod. v. Coppaken (In re Coppaken)*, 572 B.R. 284, 325 (Bankr. D. Kan. 2017). None of the assets identified in the Plaintiffs' § 727(a)(5) claim were owned by her and, thus, would not have become property of her estate and would not have been available to pay Debtor's debts. Thus, her alleged failure to explain the disappearance of Mr. Barr's assets is not a basis for denial of discharge under § 727(a)(5).

    B.    **§ 727(a)(4)(A)**

Next, the Plaintiffs allege a claim under § 727(a)(4)(A), which provides that discharge may be denied if the debtor "knowingly and fraudulently, in or in connection with the case—made a false oath or account." False oaths include a debtor's failure to include assets on her bankruptcy schedules. However, the omissions must be "material" to be grounds for denial of discharge. *Fogal Legware of Switzerland, Inc. v. Wills (In re Wills)*, 243 B.R. 58, 63 (9th Cir. BAP 1999). Omissions or misstatements relating to assets having little or no value may be considered immaterial and thus not a basis for denying discharge under § 727(a)(4). *Id.* Likewise, courts have held that omissions or misstatements concerning property that would not be property of the estate do not meet the materiality requirement of § 727(a)(4)(A). *E.g., Lee Supply Corp.*

*v. Agnew (In re Agnew)*, 818 F.2d 1284, 1290 (7th Cir. 1987) (concluding debtor's failure to schedule exempt interest in real property that he had previously transferred to his wife was not a basis for denying discharge).  However, an omission or misstatement relating to an asset that is of little value or that would not be property of the estate might be considered material if the omission or misstatement detrimentally affects administration of the estate.  *In re Wills*, 243 B.R. at 63.

In this case, Plaintiffs allege that Debtor failed to indicate in her Statement of Financial Affairs that she was holding property that belonged to another—namely Mr. Barr.  Plaintiffs also argue that Debtor erroneously listed the 1991 Chevy that belonged to Mr. Barr as her own, listed the sale of a Subaru did not belong to her, failed to list her former residence with Mr. Barr on her SOFA, and inaccurately listed the debt she owed to the personal representative in the probate case.  To the extent these allegations concern Mr. Barr's assets, they are not assets of the estate and have little monetary value and therefore are not material.  The other inaccuracies are minor.  Although the omissions and misstatements may have been important to Plaintiffs and possibly to the probate case, they did not adversely affect the administration of the Debtor's bankruptcy estate, which is what § 727(a)(4) is concerned with.  Accordingly, the Court finds that Plaintiffs have failed to prove their § 727(a)(4)(A) claim.

## II.  DISCHARGEABILITY OF THE $55,403 JUDGMENT

### A.  Collateral Estoppel Effect of the State Court Judgment

The Plaintiffs seek to have the $55,403 judgment awarded by the state court declared nondischargeable pursuant to § 523(a)(2), (a)(4), or (a)(6).  A necessary predicate to all three claims is establishing the existence of that debt and the state court's reasoning for the award.  The state court apparently issued two orders and a judgment concerning this debt—the April 4 Order, which gave the state court's reasoning but no dollar amount; the May 18 Order, which set the dollar amount at $55,403; and the September Judgment in the amount of $55,403.

Prior to trial, Plaintiffs argued in a Motion in Limine that the April 4 Order should be given limited collateral estoppel effect in this proceeding to establish that the Debtor's common law wife claim was substantially groundless.  The Debtor did not object and the Court granted this request.  At the time of this pre-trial ruling, however, the Court was unaware that the Motion in Limine omitted two key facts—the existence of the May 18 Order and the September Judgment.  These facts are important in determining whether to apply collateral estoppel.

Under Colorado law, the required elements of collateral estoppel are: (1) the issue to be precluded is identical to an issue actually litigated and necessarily adjudicated in the prior proceeding; (2) the party against whom estoppel is sought was a party to or was in privity with a party in the prior proceeding; (3) there was a final judgment on the merits in the prior proceeding; and (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issues in the prior proceeding.  *Michaelson v. Michaelson*, 884 P.2d 695, 700-01 (Colo.1994).  The only

questionable element in this case is number three—finality. To be considered final, an order must be "'sufficiently firm' in the sense that it was not tentative, the parties had an opportunity to be heard, and there was an opportunity for review." *Carpenter v. Young*, 773 P.2d 561, 568 (Colo. 1989). Finality for purposes of collateral estoppel is not the same as finality for purposes of appeal. *Id.* (noting that collateral estoppel "is not concerned with whether a claim is properly postured for appeal."). However, a pending appeal or the right to file a further appeal will typically render a state court order non-final for collateral estoppel purposes under Colorado law. *Rantz v. Kaufman*, 109 P.3d 132, 141 (Colo. 2005) (holding that judgment on appeal is not final for collateral estoppel purposes); *Barnett v. Elite Prop. of Am., Inc.*, 252 P.3d 14, 22-23 (Colo. App. 2010) (holding that pending petition for certiorari rendered judgment non-final for collateral estoppel purposes).

Plaintiffs argued in their Motion in Limine that the April 4 Order was final for purposes of appeal because it "disposes of and is conclusive of the controverted claim for which that part of the proceeding was brought," and because the Debtor did not file an appeal within forty-nine days of entry of the April 4 Order as required by Colo. R. App. P. 4(a). Plaintiffs' Motion in Limine, ¶ 8 (citing *In re Estate of Scott*, 119 P.3d 511, 514 (Colo. App. 2004)). There are several problems with this argument. The finality standard quoted by Plaintiffs is incorrect. The *In re Estate of Scott* case, on which Plaintiffs rely, specifically holds that the above-quoted finality standard *does not* apply in Colorado. *In re Estate of Scott*, 119 P.3d at 514 (holding that application of the quoted standard, which originates in Texas, "creates policy and procedure that is contrary to the applicable statute and rules and, as a result, sets a trap for litigants and trial courts."). Instead, in Colorado, for an order awarding attorney's fees under Colo. Rev. Stat. § 13-17-102 to be considered final for appeal purposes, it must at least determine the amount of fees awarded. *Axtell v. Park School Dist. R-3*, 962 P.2d 319, 322 (Colo. App. 1998). The April 4 Order did not make that determination and, thus, was not final when entered, as represented by Plaintiffs in the Motion in Limine.

That leaves the May 18 Order and the September Judgment, both of which recited the amount of attorney's fees awarded. Typically, entry of a final judgment is what triggers the appellate period. *See* Colo. R. Civ. P. 58 (requiring state courts to promptly enter a final judgment); Colo. R. App. P. 4(a) (providing that appeal must be filed "within 49 days of the date of the entry of the judgment, decree, or order from which the party appeals."). In this case, there was a significant delay between entry of the May 18 Order and the September Judgment. The Plaintiffs indicate that they filed a motion for entry of the September Judgment so that they could pursue post-judgment collection remedies when it became clear that the Debtor would not pay. At that time, both the Plaintiffs and the state court were unaware of the Debtor's bankruptcy filing, and the state court entered the September Judgment two months after the Debtor had filed her bankruptcy petition. Because entry of the September Judgment violates the automatic stay, it is void and without effect. *Calder v. Job (In re Calder)*, 907 F.2d 953, 956 (10th Cir. 1990). Absent entry of a final judgment, the Debtor could conceivably appeal the attorney fee award because the Bankruptcy Code generally stays filing deadlines that have not expired prior to the petition date. *See* 11 U.S.C. § 108(a).

5

The Plaintiffs dispute this contention, arguing that the May 18 Order is final despite the invalidity of the September Judgment. Under the Federal Rules of Civil Procedure, courts must enter both an order and a separate judgment in most instances. Fed. R. Civ. P. 58(a) ("Every judgment . . . must be set out in a separate document."). There is no such requirement in the Colorado Rules of Civil Procedure. Instead, the corresponding state rule requires state courts to "promptly prepare, date, and sign a written judgment." Colo. R. Civ. P. 58(a). The term "judgment" is defined to include "an appealable decree or order as set forth in C.R.C.P. 54(a)." *Id.* Colorado Rule 54(a), in turn, defines "judgment" broadly to include any "decree and order to or from which an appeal lies." Colo. R. Civ. P. 58(a). Colorado courts have construed this definition broadly. "When determining if an order is final for purposes of appeal, the legal effect of the order, and not merely the form, should be considered." *People v. Proffitt*, 865 P.2d 929, 931 (Colo. App. 1993). "A final judgment is one which ends the particular action in which it is entered, leaving nothing further for the court pronouncing it to do in order to completely determine the rights of the parties involved in the proceeding." *Moore & Co. v. Williams*, 672 P.2d 999, 1002 (Colo. 1983). Thus, something as simple as a minute order can serve as a "final judgment" under the Colorado Rules if it finally determines the parties' rights. *Id.*

In this case, the May 18 Order appears to have completely determined the rights of the parties with respect to the attorney fee award under Colo. Rev. Stat. § 13-17-102. It effectively put an end to that legal issue. While the April 4 Order was not final because the state court still needed to determine the amount of the fees awarded, the May 18 Order accomplished this task. *See Axtell v. Park School Dist. R-3*, 962 P.2d 319, 322 (Colo. App. 1998). Although the September Judgment may have helped the Plaintiffs in pursuing post-judgment collection remedies, its entry was not necessary under the Colorado Rules to start the applicable appellate filing deadline. This means Debtor would have had to file an appeal of the May 18 Order on or before July 6, 2018. Debtor did not do so and the appellate period expired prior to her bankruptcy filing. Thus, the Court concludes that the state court's award of $55,403 in attorney's fees under Colo. Rev. Stat. § 13-7-102 was final for collateral estoppel purposes.

B. **Judicial Notice**

This does not fully resolve issues relating to the Plaintiffs' $55,403 state court judgment. At trial, Plaintiffs failed to offer the April 4 Order, the May 18 Order, and the September Judgment as exhibits at trial and, as such, the Court did not admit them into evidence. Typically, a court may only consider admitted evidence in making its findings and conclusions. *See Tal v. Harth (In re Harth)*, 2014 WL 4294942, at *8 (10th Cir. BAP Sept. 2, 2014). The fact that Plaintiffs attached the April 4 Order to their Complaint and their Motion in Limine does not change this conclusion. *Id.* Despite this omission, the Plaintiffs argue this Court may take judicial notice of the April 4 Order and the May 18 Order and, therefore, consider the contents of those orders in ruling on their § 523(a) claims.

Courts can, in some circumstances, take judicial notice of court documents that are a matter of public record. *See* Fed. R. Evid. 201. The Tenth Circuit has instructed

6

that courts "may take judicial notice of the existence of the opinions of other courts but not the truth of the facts recited therein." *Gilchrist v. Citty*, 71 Fed. App'x. 1, 3 (10th Cir. 2003) (internal quotations and citations omitted). However, the Tenth Circuit has also noted that the scope and reach of judicial notice has been enlarged over the years to include "those matters that are verifiable with certainty." *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979). Thus, a federal court "in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *Id*. This includes use of judicial notice when applying collateral estoppel to another court's order. *Id.*; *see also Rose v. Utah State Bar*, 471 Fed. App'x 818, 820 (10th Cir. 2012) (holding trial court appropriately took judicial notice of prior state court proceedings in ruling on summary judgment motion on collateral estoppel grounds).

In this case, the Plaintiffs ask this Court to take judicial notice of the April 4 and May 18 Orders in order to give the amount and legal basis for those Orders limited collateral estoppel effect in this case. The Court has determined that collateral estoppel is appropriate on that limited basis. The prior state court proceeding involved the same parties, and the state court's ruling is the basis for the Plaintiffs' § 523(a) claim related to the attorney fee award. The Debtor did not dispute the validity of the $55,403 judgment, nor the fact that the state court determined that her common law wife claim was substantially groundless. Accordingly, in these limited circumstances, the Court will take judicial notice of the April 4 and May 18 Orders.

    **C.**    **Nondischargeability of the $55,403**

Plaintiffs argue the $55,403 judgment is nondischargeable under § 523(a)(2), (a)(4) and (a)(6). The Court concludes that the only subsection potentially applicable to this debt is § 523(a)(6).

Section 523(a)(2) does not apply because the Debtor did not obtain the $55,403 from the Plaintiffs through fraud. Section 523(a)(2) excepts from discharge a debt for "money, property, services or an extension, renewal or refinancing of credit *to the extent obtained by*," false pretenses, a false representation, or actual fraud. 11 U.S.C. § 523(a)(2)(A) (emphasis supplied). The Supreme Court has emphasized that the phrase "to the extent obtained by" modifies "money, property or services." This means there is a requirement that "specific money or property has been obtained by fraud." *Cohen v. de la Cruz*, 523 U.S. 213, 218-19 (1998). Once that predicate is established, then any debt arising from the fraud is nondischargeable. *Id.* In this case, while the Debtor incurred a debt for $55,403, that debt did not arise by her obtaining money, property or services from the Plaintiffs. The Plaintiffs may have advanced those funds to their attorney during the state court proceedings, but those advances were in no way "obtained by" the Debtor through fraud. Rather, Debtor's obligation arose because the state court imposed a sanction on the Debtor for asserting a substantially groundless claim. The fact that the Plaintiffs are beneficiaries of the state court's sanction award is not sufficient to meet the "obtained by" requirement of § 523(a)(2)(A). *Oasis, Inc. v. Fiorillo (In re Fiorillo)*, 520 B.R. 355, 359-60 (Bankr. D. Mass. 2014) (holding that

7

§ 523(a)(2)(A) did not apply to the debtor's obligation to pay plaintiff attorney's fees awarded as a sanction by a state court); *Golant v. Care Comm, Inc.*, 216 B.R. 248, 254-55 (N.D. Ill. 1997) (affirming dismissal of similar § 523(a)(2)(A) claim); *Haeske v. Arlington (In re Arlington)*, 192 B.R. 494, 499-500 (Bankr. N.D. Ill. 1996) (dismissing similar § 523(a)(2)(A) claim). Nor is § 523(a)(4) applicable because Plaintiffs have not alleged that the Debtor obtained the $55,403 debt through embezzlement or larceny, or that she acted in a fiduciary capacity.

This leaves the § 523(a)(6) claim. This subsection makes nondischargeable debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). To establish nondischargeability under this section, a creditor must establish both a willful act and a malicious injury. *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004). Willfulness "takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). The debtor must "intend 'the consequences of an act,' not simply 'the act itself.'" *Id.* at 61-62. Courts have recognized two ways of establishing willful conduct. The debtor must either "desire to cause the consequences of his act or believe that the consequences are substantially certain to result from it." *In re Moore,* 357 F.3d at 1129 (internal quotation omitted). The latter "substantial certainty" test is not an objective test. *Via Christi Reg. Med. Center v. Englehart (In re Englehart)*, 2000 WL 1275614, at *3 (10th Cir. Sept. 8, 2000). Rather, willfulness under both standards is a wholly subjective test dependent on the state of mind of the debtor. *Id.*

A malicious injury under § 523(a)(6) has been defined in different ways. The Tenth Circuit has defined it in a manner that is similar to the definition of willful: "the term 'malicious' requires proof 'that the debtor either intend the resulting injury or intentionally take action that is substantially certain to cause the injury.'" *In re Moore*, 357 F.3d at 1129 (citing *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir. 1995)). Because this seems somewhat duplicative, other courts have used the definition set forth by the Supreme Court in *Tinker v. Colwell*, 193 U.S. 473 (1904), of a "wrongful act, done intentionally, without just cause or excuse." 193 U.S. at 489; *see also Bombadier Capital, Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869, 880 (Bankr. D. Colo. 2004) (citing *Tinker v. Colwell*, 193 U.S. 473 (1904)); *America First Credit Union v. Gagle (In re Gagle)*, 230 B.R. 174, 181 (Bankr. D. Utah 1999). Since the § 523(a)(6) standards for "willful" already include a "wrongful act" that is "done intentionally," these courts hold that the malice prong "is satisfied upon a showing the injury was inflicted without just cause or excuse." *In re Tinkler,* 311 B.R. at 880.

Other bankruptcy courts have determined that attorney fee awards and other sanctions awarded against a debtor for his or her conduct during prior litigation are nondischargeable under § 523(a)(6). *E.g.*, *Hughes v. Arnold*, 393 B.R. 712, (E.D. Calif. 2008); *Erie Ins. Group v. Chaires (In re Chaires)*, 249 B.R. 101, 107 (Bankr. N.D. Tex. 2000); *Freimuth v. Kutchins (In re Kutchins)*, 2008 WL 5633634, at *5-6 (Bankr. M.D. Fla. Dec. 5, 2008) (citing cases). In many instances, the court that originally awarded the fees also made a finding that equates the sanctionable conduct to willful and malicious behavior. For example, in *In re Chaires*, a state court had found that the

debtor brought his state court action without substantial justification and had acted in bad faith resulting in a gross abuse of the judicial process, and ordered the debtor to pay the other party's attorney's fees. The bankruptcy court determined that the state court's findings were sufficient to establish a § 523(a)(6) claim because they demonstrated that the debtor intended to harm the other party by forcing that party to "incur the costs of defending this unjustified civil action maintained in bad faith." *Id.* at 108.

However, not all attorney's fees and sanction awards automatically meet the § 523(a)(6) standard. Sometimes, the state court judgment will lack sufficient findings to establish willful and malicious conduct. In that case, a claimant must produce additional evidence at trial to establish the required elements. Sanctioned conduct that is shown to be merely reckless or the exercise of poor legal judgment will not suffice. *Vehicle Removal Corp. v. Lopez (In re Lopez)*, 269 B.R. 607, 614 (Bankr N.D. Tex. 2001) (concluding debtor's filing of state court law suit was merely reckless); *see also Hamrah v. Couloute (In re Couloute)*, 538 B.R. 184, (Bankr. D. Conn. 2015) (concluding monetary sanction imposed on debtor in state court litigation for failure to comply with discovery order was not willful or malicious).

In this case, the state court awarded fees under Colo. Rev. Stat. § 13-17-102 after determining that the Debtor's common law wife claim lacked "substantial justification" because it was "substantially groundless." April 4 Order, at 5. The statute defines the term "lacked substantial justification" to mean "substantially frivolous, substantially groundless, or substantially vexatious." *Id.* § 13-17-102(4). The statute does not further define these terms. However, Colorado courts have determined that a claim is "substantially groundless" if "the allegations of the complaint, though sufficient to survive a motion to dismiss for failure to state a claim, are not supported by any credible evidence at trial." *Redmond v. Chains, Inc.*, 996 P.2d 759, 765 (Colo. App. 2000). An action is not groundless merely because it is unsuccessful. The test "assumes that the proponent has a valid legal theory but can offer little or nothing in the way of evidence to support the claim." *Bilawsky v. Faseehudin*, 916 P.2d 586, 590 (Colo. App. 1996).

The state court concluded that Debtor's common law wife claim "was not supported by any credible evidence at trial." April 4 Order at 4. The state court rejected the Debtor's excuse that she was prevented from testifying at trial due to the state court's exclusion her testimony under the Colorado's Dead Man's Statute, Colo. Rev. Stat. § 13-90-102. The state court held that, in making its decision, it could consider only the credible evidence that the Debtor actually presented at trial. The court went on to conclude that the Debtor's "strategic decision to assume that the Court would agree with her analysis of the applicability of Colorado's Dead Man's Statute to this case cannot now be used to excuse her dearth of admissible credible evidence presented at trial." *Id.* at 5.

These findings are insufficient, by themselves, to establish willful and malicious behavior because there is no mention of the Debtor's intent. However, other evidence of the timing and circumstances surrounding the Debtor's common law wife claim give a

sufficient picture of that intent. There is obvious acrimony between the Debtor and the Plaintiffs. This acrimony appears to have existed at the time of Mr. Barr's death and seemingly increased during the probate case. Plaintiffs testified that shortly after his death, they attempted to get access to Mr. Barr's belongings but the Debtor refused to allow them in the apartment and instead put the youngest daughter's belongings and a small selection of Mr. Barr's clothing and belongings on the front porch. Both of Mr. Barr's daughters credibly testified that the Debtor was hostile and very uncooperative concerning Mr. Barr's property after his death, despite their multiple attempts to communicate with her. At one point, the Debtor sought a restraining order against the Plaintiffs, but a state court denied that request. The parties were also in conflict over the disposition of Mr. Barr's remains. The Plaintiffs ultimately planned the funeral without the Debtor's involvement.

The Plaintiffs filed their application for appointment of a personal representative on February 14, 2014. From the very start of the probate case, the Plaintiffs, through a series of letters and emails between counsel, informally requested that the Debtor return Mr. Barr's property to them. Ex. 18. These requests included descriptions of that property. *Id.* The Debtor, who hired a succession of three different attorneys during the probate case, refused to do so. After months of getting no cooperation from the Debtor, the personal representative was forced to file a formal motion seeking the return of Mr. Barr's property. Ex. 16. In response, the Debtor asserted her common law wife claim, thereby further delaying the state court's ruling on turnover of Mr. Barr's property.

About one month before asserting her common law wife claim, the Debtor rented a storage unit. Records kept by the storage facility show that she accessed this storage unit multiple occasions, sometimes for hours at a time. Ex. 29. Plaintiffs gained access to this storage unit only after filing this proceeding and discovered in it a significant amount Mr. Barr's personal property—much of the same property that the Plaintiffs had been asking the Debtor to return since Mr. Barr's death. The Debtor has given a variety of reasons for her refusal to return Mr. Barr's property, including that she did not have possession of it, that the property was located in some "unknown storage unit" that Mr. Barr allegedly rented before his death, or that the property really belonged to her or her mother. She also testified that she had no idea the property was in the storage unit because her family moved it there without her knowledge and she somehow "missed" seeing it on the multiple occasions she accessed the storage unit. The Court did not find any of the Debtor's explanations credible. The very fact that her explanations changed over time renders them implausible, especially given that she now admits that much of the property was in her storage unit the entire time. The Court concludes that the Debtor knowingly stored Mr. Barr's property in her storage unit and knowingly refused to return it to the Plaintiffs.

Of course, none of this was known to the Plaintiffs at the time, as they continued to fight with Debtor in the probate case. In early 2016, the state court held an evidentiary hearing on the Debtor's common law wife claim. The Debtor's evidence consisted of the testimony of four witnesses and a copy of an automobile insurance policy. At the conclusion of the Debtor's case, the Plaintiffs moved for dismissal and the state court granted that request. In making its ruling, the state court focused on the

three factors that are key under Colorado law: the duration of the claim of marriage, cohabitation, and general repute.  The court found the second factor unhelpful given the modern prevalence of cohabitation.  On the other two factors, the state court found there to be a "dearth of credible evidence [or] convincing evidence."  Ex. 35, at 125:17-18. The court characterized the Debtor's witnesses' testimony as inconclusive and containing "inconsistencies," and questioned the motives of at least two of the witnesses.  The offered insurance policy listed the Debtor and Mr. Barr's marital status as "married," but the court found the document to be merely a conclusory statement that was, without further evidence as to its context and source, unpersuasive.  The court also focused on Debtor's failure to provide any of the evidence that is typically offered to prove a common law marriage, such as joint tax returns, joint bank accounts, joint credit accounts, joint debts, joint ownership of property, or correspondence between the couple or with third parties reflecting or referring to them as husband and wife.

       This was not a case of the Debtor merely losing in state court.  Rather the Debtor refused for nearly eighteen months to turn over Mr. Barr's property to his probate estate despite having it stored in her storage unit.  Only when the estate's personal representative filed a motion to force turnover did the Debtor assert a common law marriage claim and a request to remove the personal representative.  At trial, the Debtor wholly failed to present credible evidence to support the existence of a common law marriage.  While it is true that the state court precluded the Debtor from testifying under Colorado's Dead Man's Statute, that fact did not alter the state court's conclusion in awarding attorney's fees.  The Debtor made a tactical decision to argue against established precedent regarding application of the Dead Man's Statute and lost.  She knew from the beginning the risk of this tactic because the parties had been debating the issue since the beginning of the probate case and the trial management order listed it as an issue to be determined at trial.  She nevertheless took the gamble and lost.  But even if she had won, this Court is not convinced that it would have changed the outcome.  Her attorney made an offer of proof to the state court regarding the Debtor's excluded testimony and indicated that she would have testified that she and Mr. Barr lived together, shared expenses, shared their mail with one another, were close to each other's families, and that she helped with the care of Mr. Barr's youngest daughter.  Ex 35, at 17:1-18:22.  At best, such testimony would have established cohabitation, a factor that the state court disregarded as unhelpful and unconvincing.

       Based on all of these circumstances, the Court concludes that the Debtor knowingly asserted a groundless common law wife claim in a last-ditch effort to forestall the Plaintiffs from obtaining Mr. Barr's property.  She either desired or was substantially certain that filing the common law wife action would cause the Plaintiffs to engage in further needless litigation in attempt to secure Mr. Barr's property.  By filing a baseless claim, the Debtor was at least substantially certain that the Plaintiffs would incur attorney's fees during the litigation.  The Debtor had no credible evidence to support her common law wife claim and brining it was without just cause or excuse.  Thus, the Court concludes that the Debtor's conduct in bringing her groundless common law wife claim was both willful and malicious.  As such, the $55,403 judgment is nondischargeable under § 523(a)(6).

## III. MR. BARR'S PERSONAL PROPERTY

### A.     Nondischargeability Under § 523(a)

The Plaintiffs' final claim relates to the personal property that Mr. Barr owned prior to his death that the Plaintiffs allege the Debtor improperly kept for herself despite multiple requests that she return that property. Plaintiffs do not have a state court judgment against the Debtor for the value of the personal property. Instead, Plaintiffs ask this Court to enter a judgment for its value and declare it a nondischargable debt under § 523(a)(2)(A), (a)(4), or (a)(6).

The Tenth Circuit has held that a dischargeability claim requires a two-step analysis: first, the bankruptcy court must determine the validity of the debt; and second, the court must determine the dischargeability of that debt under § 523. *Resolution Tr. Corp. v. McKendry (In re McKendry)*, 40 F.3d 331, 336 (10th Cir.1994); *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 8 (10th Cir. BAP 2013). Whether a debt exists is determined by applicable non-bankruptcy law, usually state law. *In re Thompson*, 555 B.R. at 8. In the case of § 523(a)(2) claims, the underlying claim is typically a state-law fraud claim, although that is not a requirement. *Id.* at 9. In this case, the Plaintiffs contend that the Debtor retained Mr. Barr's property through fraud as a basis for their § 523(a)(2) claim. On their § 523(a)(6) claim, Plaintiffs do not specifically identify an underlying state law claim but nevertheless argue that the Debtor's retention of Mr. Barr's property amounts to willful and malicious behavior. For their § 523(a)(4) claim, Plaintiffs contend the Debtor is liable for larceny of Mr. Barr's property. The Court concludes the Plaintiffs' nondischargeability claim is actionable under § 523(a)(6), but not § 523(a)(2) or (a)(4).

The elements of a claim of larceny under § 523(a)(4) are typically defined by federal common law rather than state law. Under the federal common law definition, the elements of larceny are: (1) the capture (2) and taking away (3) of personal property (4) of another: (5) of some value; (6) with *animus furandi* or intention to steal. *Bryant v. Lynch (In re Lynch)*, 315 B.R. 173, 180-81 (Bankr. D. Colo. 2004). Inherent in these elements is the requirement that a plaintiff establish ownership of the property taken. *Marbella, LLC v. Cuenant (In re Cuenant)*, 339 B.R. 262, 277 (Bankr. M.D. Fla. 2006). Establishment of ownership is complicated in this case by the fact that Mr. Barr's probate case was still pending when the Debtor filed her bankruptcy case. As stated above, the state court appointed a personal representative to assist with administration of the probate estate. Under Colorado law, an appointed personal representative takes possession and control of the decedent's property. Colo. Rev. Stat. § 15-12-709. Until the personal representative's appointment is terminated, she "has the same power over the title to property of the estate that an absolute owner would have, in trust however, for the benefit of the creditors and others interested in the estate." *Id.* § 15-12-711. The personal representative is charged with fully administering the probate estate, which includes first paying any allowed claims, expenses of administration and taxes, and then distributing the estate to the decedent's heirs. *See id.* § 15-12-1003.

In this case, the personal representative was in the midst of administering Mr. Barr's probate estate when the Debtor filed bankruptcy. The representative had filed a motion seeking return of Mr. Barr's personal property from the Debtor, but the state court had not ruled on that motion.[2] Plaintiffs' post-trial brief points out that they obtained an order from this Court granting them relief from stay to proceed with the probate case, but they fail to disclose whether any further proceedings actually occurred. Thus, the Court must assume that administration is not complete and that the personal representative still has title to Mr. Barr's property rather than the Plaintiffs. While Mr. Barr's daughters are his only heirs, they will not take ownership of Mr. Barr's property until the personal representative fully administers the probate estate. Because the Plaintiffs have not established that they personally owned the property at issue at the time the Debtor allegedly wrongfully withheld it, their § 523(a)(4) claim based on larceny must fail.

For similar reasons, the facts do not fit easily within a fraud claim under § 523(a)(2). That subsection makes nondischargeable a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). Here, the Plaintiffs' complaint alleges that the Debtor owes them a debt for Mr. Barr's property that she allegedly kept from them through fraud, false pretenses or false representations. However, as discussed above, at the time of Debtor's alleged fraudulent conduct, Mr. Barr's property technically belonged to his probate estate rather than to the Debtors. In other words, to the extent the Debtor "obtained" Mr. Barr's "property" through fraud she "obtained" it from the probate estate. Any debt she owes for fraudulently withholding that property would be owed to the probate estate and not to the Plaintiffs.

The Plaintiffs' arguments concerning Mr. Barr's property are more accurately described as a claim for intentional or malicious interference with inheritance. The Restatement (Second) of Torts describes this tort as "[o]ne who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to the other for loss of the inheritance or gift." Restatement (Second) of Torts § 774B. This Court could not find a Colorado case that specifically recognizes this tort. However, federal cases arising in Colorado have done so. *See Lindberg v. United States*, 164 F.3d 1312, 1319 & n.4 (10th Cir. 1999); *Peffer v. Bennett*, 523 F.2d 1323, 1326 (10th Cir. 1975); *McGregor v. McGregor*, 101 F. Supp. 848, 849-50 (D. Colo. 1951), *aff'd*, 201 F.2d 528 (10th Cir. 1953). These courts describe the elements of intentional interference with inheritance as: (1) that defendant intentionally interfered with the giving or leaving of property to the plaintiff; (2) that defendant used unlawful means, such as fraud, duress or undue influence, to accomplish the interference; and (3) proof of damages. *Peffer*, 523 F.2d at 1325. The intent element required for this tort is that the defendant acted "purposely and knowingly." *Id*.

---

[2] The order the state court entered postpetition violated the automatic stay and is therefore void.

13

These elements dovetail with the nondischargeability elements under § 523(a)(6) for willful and malicious injury. As detailed above, to prove a willful injury under § 523(a)(6), there must be evidence that the debtor either desired to cause the consequences of her act or believed that the consequences are substantially certain to result from it. To be a malicious injury, the debtor either intend the resulting injury or intentionally take action that is substantially certain to cause the injury, with no just cause or excuse.

As described more fully above, the Plaintiffs have established that the Debtor knowingly asserted a groundless common law wife claim in an effort to forestall the Plaintiffs from obtaining their inheritance from Mr. Barr. Prior to filing her common law wife claim, the Debtor knowingly stored a substantial portion of Mr. Barr's personal property in her storage unit so as to avoid returning it to the probate estate or to Plaintiffs. The Debtor gave conflicting and inaccurate stories about the property during the probate case and the bankruptcy case, sometimes claiming she did not have possession of it, other times saying the property was located elsewhere, or that the property really belonged to her. These circumstances adequately establish that the Debtor knew and intended her actions to deprive Mr. Barr's daughters from receiving Mr. Barr's property. She used unlawful means, including assertion of a groundless common law marriage claim and making misrepresentations about the location of the property to accomplish her interference with the Plaintiffs' inheritance. The Debtor desired the consequences of these actions, and intended or was substantially certain that her actions would cause injury to the Plaintiffs by denying them their inheritance, with no just cause or excuse since the state court found she had no credible admissible evidence to establish her common law wife claim.

### B.   Damages

#### 1.   Items Withheld From Inheritance

This leaves the final element of an interference with inheritance claim—the existence and amount of damages. Typically, the measure of damages for intentional interference with inheritance is the amount of pecuniary loss suffered by the one deprived on the inheritance, plus consequential losses and any damages for emotional distress. *See* Restatement (Second) of Torts § 774B cmt. e, § 774A. In this case, the Plaintiffs have only sought the value of Mr. Barr's property that the Debtor allegedly kept from them. To prove this amount, the Plaintiffs offered an inventory listing 116 items and their estimated value (the "Inventory"). Ex. 3. The total value of the property on the Inventory is $34,465. The Debtor disputed the accuracy of the list. She argued there is no evidence that Mr. Barr owned every item on this list when he died and that some of the property belonged to her. She also argued that the values are exaggerated.

Melanie Barr, Mr. Barr's ex-wife, testified that she created the Inventory, with assistance from Moira Barr. Melanie included items that she had purchased for Mr. Barr during their marriage, such a Tag Hauer watch, as well as items that Mr. Barr was awarded in their divorce proceeding. The Court believes Melanie Barr made an honest attempt to create a complete list. However, Melanie Barr and Mr. Barr had been

14

divorced for many years prior to his death, and she lacks any firsthand knowledge of what he actually owned at his death. Even though she gave him some of the items during their marriage and they were still his assets at the time of their divorce, Mr. Barr could have easily discarded, lost, sold, or given away those items in the intervening years.

Plaintiffs also prepared a second inventory that listed all of the items they found in the Debtor's storage unit. Such a listing would have been helpful to establish Mr. Barr's ownership of those items. Unfortunately, while Plaintiffs included this "Inventory of Public Storage Unite 630 Sheridan, Denver, CO 80202" on their exhibit list (exhibit 28), they failed to offer it as an exhibit at trial. As such, the Court could not consider it.

Mr. Barr's youngest daughter, Moira, did have firsthand knowledge of her father's personal property, to the extent it was visible in his apartment, because she lived there part-time. She credibly testified that she was in the apartment the day before his death and saw the same personal property that ended up in Debtor's storage unit stored in a spare room in the apartment. On the witness stand, Moira reviewed pictures of items found in the storage unit as well as pictures of his property in his apartment before his death, and identified those items that belonged to her father. The Court has listed these items on the attached Exhibit A. Moira also testified that she saw her father's bible in the apartment shortly before his death. Both daughters testified that Mr. Barr wore his wrist watch every day. The Court will also presume that Mr. Barr stored his clothing in the apartment. These items are also listed on Exhibit A. The Court finds that the Plaintiffs have established that the Debtor wrongfully withheld the items listed on Exhibit A from Mr. Barr's probate estate, thereby causing damage to the Plaintiffs. To the extent the Debtor testified that some of these items actually belonged to her or her mother, the Court did not find that testimony to be credible.

The Inventory includes many other items that were not located in the storage unit, nor identified in pictures. For these items, the Court received little testimony or other corroborating evidence of Mr. Barr's ownership. Moira testified only generally that "most" of the items on the Inventory were also in the apartment the weekend before Mr. Barr's death. Without more, the Court cannot determine that Mr. Barr owned all these items on the date of his death. Thus, the Court has omitted many Inventory items from Exhibit A.

Two possible exceptions are the two Chevy Suburbans listed on the Inventory. Plaintiffs admitted into evidence documents showing that a 1989 Chevy Suburban and a 1991 Chevy Suburban had been titled solely in Mr. Barr's name until December 21, 2013, when Mr. Barr sold them to the Debtor. Ex. 6. The Debtor filed the title paperwork showing these transfers with the Department of Motor Vehicles four days after Mr. Barr's death. The Plaintiffs question this timing, and point out that Mr. Barr had apparently listed both vehicles as his sole property on a financial statement he prepared near the time of his death. The Plaintiffs did not offer a copy of this financial statement, but the Debtor admitted she had seen the statement and that Mr. Barr had listed the vehicles as his. She nevertheless claims Mr. Barr transferred the vehicles to her because they wanted to sell them and it was easier for her to handle the sale given Mr.

Barr's long work hours. On both vehicles' titles, in the "transfer of ownership" section, Mr. Barr's signature is contained on the line marked as "seller" next to the Debtor's name as "buyer." No evidence was offered that this signature was suspicious or otherwise forged. Moreover, the Court does not find the timing to be suspicious. Given his suicide a few days after the holidays, he was likely trying to wrap up some of his affairs. Thus, the Court concludes that Mr. Barr sold the vehicles to the Debtor prior to his death. Because Mr. Barr did not own the vehicles at the time of his death, the Debtor's retention of them did not cause the Plaintiffs any damage.

### 2.     Value of Items

The value of the items that the Debtor withheld from Plaintiffs' inheritance is more difficult to determine. Melanie Barr listed values for each piece of property included on the Inventory, but the Court finds these values to be highly inflated, even though it did not receive any contrary valuation testimony. Nor did the Court receive any testimony as to how Melanie Barr arrived at those values. The Plaintiffs concede that none of the items were new or had substantial value. Rather, Mr. Barr's daughters wanted the items because of their sentimental value, as a reminder of their late father.

There are many ways to value personal property. In many situations involving the loss of personal property, claimants will offer evidence of market value. In this case, the property consists mostly of well-used tools, landscape equipment, camping gear, personal effects, and family mementos. There is no ready "market" for these items. Where market value is unavailable, courts attempt to determine the actual worth of the items to the owner, sometimes called the "intrinsic value" or the "value to the owner." *See Johnson v. Bd. of Cty. Comm'rs*, 336 P.2d 300, 302 (Colo. 1959); *King v. United States*, 292 F. Supp. 767, 775-76 (D. Colo. 1968); Restatement (Second) of Torts § 911 cmt. e. Courts have wide latitude in determining this value. As described by the Colorado Supreme Court:

> In establishing the actual or intrinsic value of property having no market value, wide latitude in the evidence is permissible, and resort may be had to any facts which fairly tend to show such actual value. Thus, in determining the actual or intrinsic value of such property, or its value to the owner, it has been held proper to admit evidence showing the original cost, the replacement cost, the age of the property, its use and utility, and its condition.

*Johnson*, 336 P.2d at 302.

When it comes to keepsakes and used personal property, a claimant is not necessarily limited to the second-hand or garage-sale value, as that value would not necessarily account for the fact that the goods may have unique value to the claimant. *See* Restatement (Second) of Torts § 911 cmt. e ("Second-hand clothing and furniture have an exchange [or market] value, but frequently the value is far less than its use value to the owner. In these cases it would be unjust to limit the damages for destroying or harming the articles to the exchange value."). However, a damage award cannot be

16

based on "sentimental value" to the injured party. *Id.*; *Webster v. Boone*, 992 P.2d 1183, 1186 (Colo. App. 1999) ("Although there are varying standards for measuring damages for the loss of photographs and similar items of personal property which either have no market value or whose value to the owner is greater than their market value, we agree with those decisions that have declined to allow recovery for the sentimental or emotional value of such items.").

In addition, an award of damages cannot be based upon mere speculation. *King*, 292 F. Supp. at 775. The Restatement of Torts instructs that a claimant must prove damages "with as much certainty as the nature of the tort and the circumstances permit." Restatement (Second) of Torts § 912. While definiteness as to the amount of damages is desirable, it is even more desirable that, "an injured person not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of harm he has suffered." *Id.* cmt. a. "When the value to the user is the measure of recovery, especially when the subject matter cannot be replaced, the measure of recovery is left very largely to the discretion of the trier of fact." *Id.* at cmt. c; *see also John Deere Co. v. Gerlach (In re Gerlach)*, 897 F.2d 1048, 1051 (10th Cir. 1990) (citing Restatement (Second) of Torts § 912 and concluding bankruptcy court should declare a debt nondischargeable "in an amount which it can reasonably estimate.").

In this case, it appears that the Inventory lists either the original cost or the replacement value of the goods, but even those values are vastly inflated. For instance, a used hatchet is listed with a value of $70, and a used hammer is valued at $100. Such items can be purchased at a local hardware store at a much lower cost. In any event, pure replacement value is not the proper measure of the damages because the Plaintiffs are not seeking to replace Mr. Barr's property with new items. The original cost is also not appropriate because that value does not account for the fact that the goods are obviously older and have been well-used. The photographs admitted as evidence plainly demonstrated to the Court that all of the items have significant wear and tear. As such, for those items on Exhibit A for which the Plaintiffs' provided a value on the Inventory, the Court has discounted that Inventory value by 75%.

Some of the items found in the storage unit were not listed on the Inventory and not specifically valued by the Plaintiffs. With these items, the Court has exercised its discretion to assign a value. The Plaintiffs provided testimony indicating that some of the items, such as Mr. Barr's bible, his personal papers, his favorite childhood book, and a letter to the tooth fairy are mementos of Mr. Barr that are irreplaceable. While the Court cannot factor the sentimental value of any items into its calculation, these momentos do have an "intrinsic value" to the Plaintiffs that exceeds what would otherwise be their garage sale value. Other items, such as a half-full bucket of ice melt or a used air mattress, are common items that do not have any demonstrable intrinsic value to Plaintiffs and thus have been given a garage sale value. The resulting total value of all items on Exhibit A is $3,376.50. This amount is a nondischargeable debt pursuant to 11 U.S.C. § 523(a)(6).

      The Court notes that the Debtor, in her closing statement, indicated a willingness to turnover Mr. Barr's property to the Plaintiffs. Technically, the Debtor would be turning over any such property to Mr. Barr's probate estate. Assuming the Debtor does so, Mr. Barr's daughters will likely eventually inherit the items. Recovery of the items themselves *and* the value of those items as damages would amount to a double recovery, a result prohibited by Colorado law. *See Lexton-Ancira Real Estate Fund, 1972 v. Heller*, 826 P.2d 819, 823 (Colo. 1992) ("Generally, a plaintiff may not receive a double recovery for the same wrong."). Thus, to the extent that Debtors eventually inherit any of the items listed on Exhibit A from Mr. Barr's probate estate, the amount of nondischargeable debt must be reduced by the value of those recovered items.[3]

## IV. CONCLUSION

      For the reasons stated above, the Court concludes that Plaintiffs demonstrated all elements to show that the Debtor owes them a debt for $55,403.45 and that this debt is nondischargeable under § 523(a)(6). The Plaintiffs have further demonstrated that the Debtor owes them a debt for $3,376.50 and that this debt is also nondischargeable under § 523(a)(6). Accordingly, the Court ORDERS that $58,779.95 plus applicable post-judgment interest, is nondischargeable in Debtor's case pursuant to § 523(a)(6). If and when the Plaintiffs inherit any items listed on Exhibit A, the nondischargeable debt shall be reduced by the listed value of that item.

      Dated this 23rd day of July, 2018.

                                                          BY THE COURT:

                                                           *[signature]*
                                                    Elizabeth E. Brown, Bankruptcy Judge

---

[3] The Court's listing of property on Exhibit A is in no way meant to preclude or limit the probate court or the personal representative of Mr. Barr's estate from establishing or determining that other property belongs to Mr. Barr's probate estate and/or his heirs.

Exhibit A

| Item | Plaintiffs' Inventory Value | Assigned Value |
|---|---|---|
| business, financial & personal records | $0.00 | $250.00 |
| landscaping equipment & tools | $1,800.00 | $450.00 |
| watch - Tag Hauer | $1,800.00 | $450.00 |
| clothes | $500.00 | $125.00 |
| cell phone | $250.00 | $62.50 |
| bible | $50.00 | $50.00 |
| Mr. Barr's childhood "Ten Little Indians" book | N/A | $300.00 |
| Ralston Valley yearbook (Mr. Barr's place of employment) | N/A | $10.00 |
| tooth fairy letter by Moira Barr | N/A | $150.00 |
| Marines mouse pad | N/A | $25.00 |
| beer can collection | $2,500.00 | $625.00 |
| Bowie knife | $1,500.00 | $375.00 |
| ammo boxes (including box with "Marines" sticker) | $400.00 | $100.00 |
| ammo | $400.00 | $100.00 |
| sleeping bag | $150.00 | $37.50 |
| air mattress | N/A | $10.00 |
| coolers | $150.00 | $37.50 |
| fishing tackle box | $250.00 | $62.50 |
| camping chair | $150.00 | $37.50 |
| "monkey butt" cream | N/A | $1.00 |
| shamwows | N/A | $1.00 |
| plate from Suburban | N/A | $5.00 |
| ACE ice melter | N/A | $10.00 |
| keys with metal plate inscribed JB | N/A | $10.00 |
| bbq grill | $300.00 | $75.00 |
| grill set | N/A | $5.00 |
| soap, shaving cream, etc. | N/A | $1.00 |
| tin boxes, leather suede & protector powder | N/A | $1.00 |
| plastic jar of change | N/A | $10.00 |
| TOTAL | $10,200.00 | $3,376.50 |